[Civ. No. 1964. Fourth Appellate District.—May 21, 1937.]

JOHN WILLIAM HUDDLESTON, Appellant, v. EARL C. POUND et al., Respondents.

[Civ. No. 1965. Fourth Appellate District.—May 21, 1937.]

WALTER C. EVANS, Appellant, v. EARL C. POUND et al., Respondents.

[Civ. No. 1966. Fourth Appellate District.—May 21, 1937.]

CARL F. ECKERT, Appellant, v. EARL C. POUND et al., Respondents.

Harry W. Horton and J. Vincent Hannon for Appellants.

Francis J. Gabel, Hickcox & Trude, Hickcox & Provence, John K. Ford and Ross T. Hickcox for Respondents.

BARNARD, P. J.—These three actions, arising out of one automobile accident, were consolidated for trial and are here submitted upon one set of briefs. In each case the court made findings in favor of the defendants and the various plaintiffs have appealed from the respective judgments.

The three persons who met their deaths in this accident were all riding as guests of the respondent Harold Pound, who was driving a Hudson sedan owned by his parents, the other respondents. The only point raised is that the court's finding in each case to the effect that Harold Pound was not guilty of wilful misconduct is not sustained by the evidence. In other words, it is contended that he must be held guilty of wilful misconduct, as a matter of law.

The accident happened about 11 o'clock P. M. on July 16, 1932, on a paved highway running from El Centro to Holtville. Harold Pound, with four other young people in the car, was driving easterly toward Holtville at a speed of about 45 miles an hour. About four miles easterly from El Centro a Maxwell car, without a top and without lights, was parked on the southerly side of the highway, facing east, with its left wheels on the pavement and its right wheels on the shoulder. Harold did not see the parked car in front of him until he was about 25 or 30 feet from it. At the same time a Chevrolet truck was approaching from the east on the north

side of this pavement. There was a deep borrow pit on the south side of the road which prevented him from going to the right of the Maxwell, so he put on his brakes, pulled to his left and attempted to pass to the left of the Maxwell car. He had observed the lights of the approaching truck and at the time he pulled over to his left he knew that that truck was fairly close to the parked Maxwell. He testified that the only thought in his mind was to miss the parked car, that he wanted to get through so nothing would happen and that he hoped to be able to do so. The driver of the truck testified that he saw the Hudson ''coming in and I got off the highway as far as I could''; that he was about 25 or 30 feet from the parked car when he started to get off the highway to his right; and that there would have been room enough for the Hudson to go between the truck and the parked car if the Hudson had not struck the Maxwell. It appears, without conflict, that the front end of the Hudson got around the Maxwell, but that its right rear end collided with the left rear end of the Maxwell, causing the rear end of the Hudson to skid to the left into the path of the truck, that the Hudson then ''sideswiped'' the truck, that its left rear half came in contact with the truck, and that it ''started on the bumper (of the truck) at the front and went all the way back''. The Hudson traveled from 50 to 85 feet after the collision.

The appellants contend that as a background for the consideration of the question before us and as showing that Harold Pound's mental attitude was one of disregard for the safety of others, we must take it as established that he was a ''reckless driver'' since he was ''repeatedly stopped by traffic officers for speeding''. This is based upon the testimony of an officer that on two occasions he had stopped him for going too fast within the city limits of Brawley. The details of his conduct at those times are not before us and, of course, they have no bearing on the way he was driving on this occasion.

It is further argued that Pound knew that his eyesight was defective, that the lights of the oncoming truck obstructed his vision to the extent that he could not see objects on the road, and that ''in spite of his own impaired vision and that he could not see the highway ahead of him or objects on the same'' he ''deliberately turned and drove to the left and around the Maxwell car with full knowledge that the truck

was coming'', and at a time when the truck ''was almost far enough west to be opposite the Maxwell car''.

While there is evidence that Harold had an astigmatism, had been advised by a doctor to wear glasses for reading and that he was somewhat nearsighted, there is also evidence that his eye condition affected only his reading and did not interfere with his driving of a car. It also appears that he had a license to drive and that the other occupant of the front seat of his car, whose eyesight is not questioned and who was watching the road ahead, did not see the parked car until Harold started to turn out for it. Without doubt the lights of the oncoming truck would affect his ability to see to a certain extent. However, the extent of any such interference and its effect upon the conduct of a driver, even when the question of ordinary negligence is concerned, is usually a question of fact and not one of law. (*Skaggs* v. *Willhour*, 210 Cal. 524 [292 Pac. 649].)

In each case the court found that Harold Pound was driving on this occasion in a prudent manner when the parked car suddenly appeared on the highway in front of him; that the parked car was on the right and the same side of the highway upon which he was driving; that two of its wheels were on the paved portion of the highway and two off the pavement; that there was no tail-light thereon and no other lights that could be observed by him; that there was no other form of warning to make known its presence; that the parked car was without a top; that a truck was approaching from the east and in a direction opposite to that in which he was driving; that immediately upon seeing the parked car he applied his brakes and turned to the left for the purpose of avoiding a collision and for the purpose of avoiding going into a deep borrow pit on the side of the highway; that the front part of the sedan which he was driving cleared the parked car but that its right rear side came in contact with the left rear side of the parked car and the sedan was thereby swung sideways into the path of the oncoming truck; that the situation created by the parked and unlighted car and the oncoming truck placed him in a position of imminent peril; and that he exercised his best judgment and acted with a conscious effort to avoid a collision and to avoid injury to himself, his guests and others.

These findings are supported by the evidence. The appellants rely particularly on the case of *Sanford* v. *Grady*, 1 Cal. App. (2d) 365 [36 Pac. (2d) 652, 37 Pac. (2d) 475]. The facts of that case were substantially different, including the absence of the element of sudden peril, which here appears. It could be said here, as was said in *Turner* v. *Standard Oil Co.*, 134 Cal. App. 622 [25 Pac. (2d) 988] : "It fully appears from the evidence that, at the time, he was endeavoring to avoid consequences which he thought more dangerous than the course he took, and that he was making an honest effort to prevent injury rather than to cause it." Under the circumstances appearing here it cannot be held that the finding and conclusion that no wilful misconduct was shown is without support in the evidence. (*Meek* v. *Fowler*, 3 Cal. (2d) 420 [45 Pac. (2d) 194].)

The respective judgments are affirmed.

Marks, J., and Jennings, J., concurred.